# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

RANDALL SCOTT NELSON, )
)
    Plaintiff, )
)
v. )   Case No. 2:24-cv-01277-SGC
)
FRANKENMUTH MUTUAL )
INSURANCE COMPANY, )
)
    Defendant. )

## MEMORANDUM OPINION[1]

This action arises from an insurance dispute between the plaintiff, Randall Scott Nelson, and the defendant, Frankenmuth Mutual Insurance Company. (Doc. 1-1).[2] Before the court is Frankenmuth's motion for summary judgment on Nelson's remaining claims for breach of contract (Count I), bad faith failure to pay (Count II), and bad faith failure to investigate (Count IV).[3] (Doc. 21). Frankenmuth's motion is fully briefed and ripe for review. (Docs. 22, 23). For the reasons set forth below, Frankenmuth's motion will be granted.

---

[1] The parties have unanimously consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c). (Doc. 11).

[2] Citations to the record refer to the document and page numbers assigned by the court's CM/ECF electronic document system and appear in the following format: (Doc. __ at __).

[3] Nelson's claims for fraud (Count III), fraudulent inducement (Count VI), and deceit (Count VII), as well as former plaintiff Marion Nelson's claims for breach of contract (Count I) and bad faith (Count II and IV) were previously dismissed. (Doc. 20).

## I.  Standard of Review

Under Rule 56 of the *Federal Rules of Civil Procedure*, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, the non-moving party must go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial. *See id.* at 324.

The substantive law identifies which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Only disputes over facts that might affect the outcome of the case will preclude summary judgment. *Id.* All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If

the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

Where, as here, a federal district court has diversity jurisdiction over state law claims, the court must apply the substantive law of the forum state. *See McMahan v. Toto*, 256 F.3d 1120, 1132 (11th Cir. 2001) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)). Consequently, substantive Alabama law applies to Nelson's claims. However, the procedural aspects of the case, including those that relate to whether evidence is legally sufficient to submit an issue to a jury, are a question of federal law. *Harrell v. Wal-Mart Stores E., LP*, 724 F. Supp. 3d 1250 (N.D. Ala. 2024).

## II. Procedural History

Nelson and his wife, Marion Kay Nelson, filed this action on September 9, 2024, in the Circuit Court of Jefferson County, Alabama, claiming: (1) breach of contract, (2) bad faith failure to pay, (3) fraud, (4) bad faith failure to investigate, (5) breach of the duty of good faith and fair dealing, (6) fraudulent inducement, and (7) deceit.[4] (Doc. 1-1 at 2). Frankenmuth removed the action to this court on September 19, 2024, and then filed a partial motion to dismiss. (Docs. 1, 4). Following briefing by the parties, the court granted Frankenmuth's motion on August 13, 2025. (Docs. 8, 9, 20). The court dismissed the Nelsons' claims for fraud (Count III), fraudulent inducement (Count VI), and deceit (Count VII), as well as Marion's claims for

---

[4] Because the Nelsons' complaint did not specifically state the causes of action for each count, the court discerned these claims. *See* Doc. 20.

breach of contract (Count I) and bad faith (Count II and IV). (Doc. 20). Thus, the only claims remaining are Nelson's claims for breach of contract (Count I), bad faith failure to pay (Count II), and bad faith failure to investigate (Count IV). (*See id.*).

## III. Undisputed Material Facts

Nelson is the owner and sole proprietor of Scott's Motorcycle Service, which he operated from a building located at 332 Decatur Highway, Gardendale, Alabama (the "Property"). (Doc. 21-4 at 9). In September 2022, Frankenmuth issued to Nelson, d/b/a Scott's Motorcycle Service, a renewal policy of commercial property insurance, policy number CPP 6638617 (the "Policy"), for the Property. (Doc. 21-2). Nelson reviewed his policy prior to the loss that is the subject of this lawsuit. (Doc. 21-4 at 40).

After being diagnosed with myasthenia gravis, Nelson closed Scott's Motorcycle Service in May 2021. (*Id.* at 29, 35). Nelson described this closure as "temporary," and a sign posted on the door to the Property stated:

Scott's Motorcycle is closed temporarily due to illness

Please check back and thanks for past business

Gary can be reached at [phone number] for your parts need

(*Id.* at 33; Doc. 22-5). Another sign posted on the door stated:

WE ARE CLOSED

Gary is now at Tech 46

[phone number]

(Doc. 22-5). In addition, on May 28, 2021, the voicemail greeting for Scott's Motorcycle Service stated:

> Thank you for calling Scott's Motorcycle Services. We are closing our store Friday, May the 28th at 7:00 p.m. We would like to thank everyone for all the years of business. We really appreciate it. Gary will be at [Tech] 46 beginning Tuesday, June 1st. That number is [phone number].

(Doc. 21-4 at 33).

During the 2022 calendar year, Scott's Motorcycle Service did not perform any work for customers or generate any income. (*Id.* at 33-36). Between June 2021 and December 2022, Nelson did not rent the Property to any tenant, remodel the Property, or have any repairs or restorations performed at the Property. (*Id.* at 37). Nelson did not inform Frankenmuth or his agent that he had closed Scott's Motorcycle Services. (*Id.* at 40).

Following the closure of Scott's Motorcycle Service, Nelson continued utility services to the Property, including electricity, water, garbage, sewer, and a telephone landline.[5] He monitored the Property through 8-14 internet-connected video cameras and visited it from time to time to check on the Property and work on various things. (*Id.* at 36, 38, 39-40). Records from Nelson's electrical bill for the Property suggest he performed some activity at the Property on October 2, 2022, but that was the last

---

[5] The record evidence Nelson cites does not directly support this contention; however, for purposes of this opinion, the court accepts it as true.

time Nelson performed any substantial activity at the Property before December 26, 2022. (*Id.*).

On December 26, 2022, Nelson visited the Property because he discovered there was no connection to the internet cameras monitoring it. (*Id.* at 34). When he arrived, he found a water pipe had burst, resulting in water damage to the Property. (*Id.*). Nelson had visited the Property in November and December of 2022, and at the time of the loss, the heating and air were fully functional. (Doc. 22-2 at 13). In December 2022, the Property stored parts, inventory, ATVs, motorcycles, and other furnishings. (*Id.*).

Nelson submitted a claim to Frankenmuth for damages. (*Id.* at 10. Frankenmuth investigated the claim by, among other things, sending an adjuster to inspect the Property, obtaining photos of the damaged Property, requesting and reviewing documents from Nelson, and examining Nelson under oath. (Doc. 22-3 at 11, 16; Doc. 21-4). Frankenmuth ultimately denied Nelson's claim on June 6, 2023, because it determined that, at the time of the loss, the Property was vacant according to the terms of the Policy. (Doc. 22-12).

The Policy provides, in relevant part:

**6. Vacancy**

**a. Description of Terms**

(1) as used in this Vacancy Condition, the term building and the term vacant have the meanings set forth in (1)(a) and (1)(b) below:

6

. . .

(b) When this policy is issued to the owner or general lessee of a building, building means the entire building. Such building is vacant unless at least 31% of its total square footage is:

(i) Rented to a lessee or sublessee and used by the lessee or sublessee to conduct its customary operations; and/or

(ii) Used by the building owner to conduct customary operations.

**b. Vacancy Provisions**

If the building where loss or damage occurs has been vacant for more than 60 consecutive days before that loss or damage occurs:

(1) We will not pay for any loss or damage caused by any of the following, even if they are Covered Causes of Loss:

. . .

(b) Sprinkler leakage, unless you have protected the system against freezing;

. . .

(d) water damage

. . .

(Doc. 21-2 at 25).

## IV.    Analysis

In support of its motion, Frankenmuth first contends it is entitled to summary judgment on Nelson's breach of contract claim because the Policy excludes coverage for the loss and because Nelson did not produce evidence of his damages.

Frankenmuth also asserts Nelson cannot prove it acted in bad faith in denying the insurance claim.

## A. Count I – Breach of Contract

To succeed on his breach of contract claim, Nelson must demonstrate (1) the existence of a valid contract binding him and Frankenmuth; (2) his own performance under the contract; (3) Frankenmuth's nonperformance; and (4) damages. *See S. Med. Health Sys., Inc. v. Vaughn*, 669 So. 2d 98, 99 (Ala. 1995) (citations omitted). Courts generally employ a three-step inquiry to determine whether a claim is covered by an insurance policy. *See USF Ins. Co. v. Metcalf Realty Co.*, No. 2:12-CV-02529-AKK, 2013 WL 4679833, at \*5 (N.D. Ala. Aug. 30, 2013) (citations omitted). First, the party seeking coverage under the policy bears the burden of establishing the claim is covered by the policy's initial grant of coverage. *Jordan v. Nat'l Acc. Ins. Underwriters Inc.,* 922 F.2d 732, 735 (11th Cir. 1991) ("Under Alabama law the general rule is that the insured bears the burden of proving coverage.") (citation omitted); *USF Ins. Co.*, 2013 WL 4679833, at \*5. Next, the insurer has the burden of establishing an exclusion in the policy precludes coverage for the claim. *Id.*; *Jordan*, 922 F.2d at 735. Then, if a policy exclusion potentially precludes coverage for a claim, the burden shifts back to the party seeking coverage to establish an exception to the exclusion applies. *USF Ins. Co.*, 2013 WL 4679833, at \*5.

In determining whether coverage exists, insurance policies should be construed "to give effect to the intention of the parties." *Twin City Fire Ins. Co. v.*

8

*Alfa Mut. Ins. Co.*, 817 So. 2d 687, 691 (Ala. 2001) (quoting *Att'ys Ins. Mut. of Alabama, Inc. v. Smith, Blocker & Lowther, P.C.*, 703 So. 2d 866, 870 (Ala. 1996)). Additionally, "it is well established 'that when doubt exists as to whether coverage is provided under an insurance policy, the language used by the insurer must be construed for the benefit of the insured.'" *St. Paul Fire & Marine Ins. Co. v. ERA Oxford Realty Co. Greystone, LLC*, 572 F.3d 893, 898 (11th Cir. 2009) (quoting *St. Paul Mercury Ins. Co. v. Chilton-Shelby Mental Health Ctr.*, 595 So. 2d 1375, 1377 (Ala. 1992)). "It is equally well settled, however, that insurers have the right to limit their liability by writing policies with narrow coverage." *Id.* (citing *Johnson v. Allstate Ins. Co.*, 505 So. 2d 362, 365 (Ala. 1987)). Accordingly, if there is no ambiguity in the terms of an insurance policy, a court must enforce the policy "as written and cannot defeat express provisions in a policy by making a new contract for the parties." *St. Paul Fire and Marine Ins. Co.*, 572 F.3d at 898 (citing *Johnson*, 505 So. 2d at 365). Further, "[w]hile language in an insurance policy should be construed in accordance with its ordinary meaning, where a policy specifically assigns to a term or phrase a meaning that goes against what is customary, the Court must not rewrite the policy so as to include or exclude coverage that was not intended." *Tate v. Allstate Ins. Co.*, 692 So. 2d 822, 824 (Ala. 1997) (internal citations omitted).

"While ambiguities or uncertainties in an insurance policy should be resolved against the insurer, ambiguities are not to be inserted by strained or twisted

reasoning." *Twin City Fire Ins. Co.*, 817 So. 2d at 692 (citation omitted). Moreover, just because a term is undefined in the policy does not mean the policy is ambiguous; rather, "the court should simply give the undefined word or phrase the same meaning that a person of ordinary intelligence would give it." *Id.* (citation omitted). Finally, in analyzing the terms of an insurance policy, "a court must examine more than the isolated sentence or term; it must read each phrase in the context of all other provisions." *Id.* at 691 (citation omitted).

### 1.  The Policy excludes Nelson's loss.

Frankenmuth argues it did not breach its contract with Nelson because the Policy language—specifically, the provision excluding coverage for a water loss where the Property has been vacant for more than 60 days—excludes Nelson's loss. In response, Nelson contends the Property was not vacant because (1) Scott's was only temporarily closed to new business; (2) the Property held substantial inventory and other items; (3) all utilities remained functional at the Property; and (4) he had visited the Property within thirty days prior to the loss. Nelson also claims the phrase "customary operations" is ambiguous because it is not defined by the Policy and should therefore be interpreted in his favor.

Nelson urges the court to interpret the term "vacant" to mean "empty, without inanimate objects, containing nothing," as that term is commonly understood by the general public, and argues the Property was not vacant because it was filled with various items and had connected utilities,. (Doc. 22 at 15). However, as explained

10

above, this court is required to interpret "vacant" as specifically defined by the Policy. *See Tate*, 692 So. 2d at 824. Thus, applying the Policy's definition, the court must conclude a building is vacant unless at least 31% of its total space is being used to conduct customary operations. (Doc. 21-2 at 25). The relevant question then is whether there is a genuine issue of material fact that Scott's was conducting customary operations at the Property within 60 days prior to the loss.

Nelson asserts he continued to conduct customary operations at the Property because (1) he maintained utility service at the Property; (2) he had internet service at the Property and could remotely monitor the Property with cameras; (3) Scott's was temporarily, not permanently, closed because of his health issues; (4) he regularly visited the Property; and (5) he stored many items at the Property. He further asserts that a jury could interpret these facts to find Scott's was conducting customary operations at the Property at the time of the loss.

At least one other court in this district has previously considered the meaning of the term "customary operations." *See Frankenmuth Mut. Ins. Co. v. Five Points W. Shopping City, LLC*, No. 2:20-CV-1288-KOB, 2022 WL 949888, at *13 (N.D. Ala. Mar. 29, 2022). In *Five Points,* the plaintiff owned a building and leased 73% of the space to a grocery store. Following a bankruptcy, the grocery store closed in April 2018. In August 2018, two men broke into the building and attempted to steal copper wire. This damaged the building, and Five Points filed a claim under its

11

insurance policy with Frankenmuth. Frankenmuth denied the claim because, as here, it contended the loss was excluded by the vacancy provision.

During the ensuing litigation, the parties disputed whether 60 days before the loss (1) the property was under renovation or (2) the grocery store was using the building to conduct its customary operations. The court found a genuine issue of material fact existed regarding whether the property was being renovated within 60 days of the loss; however, the court explicitly found the grocery store was not using the building to conduct its customary operations. Because the policy did not define "customary operations," the court considered the dictionary definitions:

> "Customary" means "commonly practiced, used, or observed." *Customary*, Merriam-Webster.com Dictionary. And an "operation" is the "performance of a practical work." *Operation*, Merriam-Webster.com Dictionary. Putting these definitions together, the question is whether Winn-Dixie was "performing its commonly practiced work" at any point after June 10, 2018 at 5 Points' building.

*Id.* at *13. The court also noted other potential interpretations of that term:

> Other courts interpreting this term have found that "customary operations" are "those for which [the lessee] leased the Property and used it on a regular basis." *See Wilheit Family Props., L.P. C. Netherlands Ins. Co.*, No. 2:11-cv-300-WCO, 2013 WL 12291715, *4 (N.D. Ga. Jan. 24, 2013) (applying Georgia law). Courts also look to whether the lessee continued to conduct "the business pursuit identified by the policy." *Saiz v. Charter Oak Fire Ins. Co.*, 299 F. App'x 836, 840 (10th Cir. 2008). So a lessee whose typical business was a family-style restaurant was not conducting "customary operations" when the lessee's owner closed the restaurant and used the space as an office while trying to find a sublessee. *Id.*; *see also Wilheit Family Props.*, 2013 WL 12291715, at *4 (finding that lessee's performing "minor maintenance and repair" to the property was not customary operation).

> Nor is "simply retaining a key to the Property" a customary operation. *Wilheit Family Props.*, 2013 WL 12291715, at *4.

*Id.* Ultimately, the *Five Points* court found the lessee was not conducting its customary operations within 60 days of the loss because (1) the building was leased to operate a grocery store and (2) in April 2018, the grocery store stopped selling groceries to the public. *Id.*[6]

> During Nelson's Examination Under Oath, the following exchange occurred:
>
> Q. Okay. So, during that time, one, you were not able to have your business open, fair –
>
> A. Correct.
>
> Q. – physically due to your health conditions? Is it also fair to say that you were not operating your business at that time, that time period?
>
> A. That's absolute.
>
> Q. Is it fair to say that you did not generate any income from doing work at your shop during that time?
>
> A. Yes, that's fair.
>
> Q. Okay. I understand there was items in your shop at that time, but you did not open your shop to the public or to anyone to be able to have work done there; is that fair?
>
> A. Because I was not physically able to.
>
> Q. And you were not able to have employees at that time to do work because of your health condition; is that fair?

---

[6] Five Points also argued the court should consider the customary operations of the grocery store's parent company, which stored and sold the grocery store's fixtures after the store closed to the public. 2022 WL 949888, at *13. The court expressed some skepticism as to this point, but declined to award Five Points summary judgment because there was a genuine issue of fact as to whether this conduct occurred within 60 days of the loss. *Id.* at *14.

A. Exactly.

. . .

A. That's what I'm saying. I've been to the shop a lot of times while the business was closed to go in and tinker around, work on trucks, transmissions, automobiles.

Q. Your personal stuff, correct?

A. And some buddies', yeah.

Q. Okay. But not for pay?

A. Exactly.

. . .

Q. . . . Okay. Let me ask you this: What kind of business did you run out of that building? Just your motorcycle?

A. Motorcycle repair and parts.

Q. Okay. Any other type of business did you run during that time? And I'm using the same time frame of June 1, 2021, to December 26, 2022.

A. I guess I thought I replied. I did not run any business out there.

Q. Okay. I just wanted to make sure.

A. Okay. Okay.

Q. Sometimes people think I'm only talking about the motorcycle business. And maybe during this time, you couldn't do the motorcycle business, but there was something – you were, then, selling used parts.

A. Now, I understand. Okay.

Q. It could have –

A. No.

Q. – been something else. I don't know

A. Okay.

14

Q. That's what I'm trying to find out.

A. Okay. Now, I understand. Okay. No.

Q. Would it be fair to say that your business, your customary business, being what you ran your business as, was a motorcycle shop repair?

A. Yes, ma'am.

Q. And you only ran a motorcycle shop repair business out of that building pretty much for the last four years; would that be fair?

A. Last twenty years, yes.

Q. Twenty. Okay. And at no time did you run any other business out of that building, is that fair?

A. Yes, ma'am.

(Doc. 21-4 at 35-36; 38). This exchange makes clear that (1) the customary business Scott's performed at the Property was to operate a motorcycle repair shop; (2) the business was not operating between June 2021 to December 2022; (3) Nelson was not operating any other business out of the Property during that time; and (4) Nelson's visits to the Property were not for the purpose of operating a motorcycle repair shop—the customary business of Scott's Motorcycle.

Nelson insists that because "customary operations" is not a defined term in the Policy, it is ambiguous. (Doc. 22 at 14). He then asserts he was using the building to conduct customary operations because (1) the utilities remained connected; (2) he monitored the Property with cameras through the internet; (3) the door sign said the business was only temporarily closed; (4) he regularly visited the Property; and (5) the building stored many items for business purposes. (*Id.*). Nelson does not,

however, offer any evidence that he, or anyone else, operated Scott's as a motorcycle repair shop in the 60 days prior to the loss.

Under Alabama law, the question of whether a contract is ambiguous is a question of law to be decided by the court. *Federated Mut. Ins. Co. v. Abston Petroleum, Inc.*, 967 So. 2d 705, 709 (Ala. 2007). Where the contract terms are plain and unambiguous, construing the legal effect of the contract is also a question of law to be decided by the court. *Id.* The phrase "customary operations" is not ambiguous here. Nelson readily admitted Scott's was a motorcycle repair shop that conducted no business and was not open to the public from June 2021 through December 2022. His focus on the presence of physical items in the building and connected utilities is misplaced. This court is constrained to apply the terms of the Policy as written, and the Policy assigns a distinct meaning to the phrase "vacant." The record makes clear there is no genuine issue of material fact as to whether Scott's Motorcycle was conducting the business of a motorcycle repair shop at the Property within 60 days of the date of the loss.[7] Because it was not conducting any such business, it was not conducting its customary operations, and the Property was vacant as contemplated by the terms of the Policy. Accordingly, the claimed loss caused by water damage is

---

[7] There is no evidence the Property was leased or renovated within the relevant time period, and the parties do not appear to dispute this.

excluded under the Policy, and Frankenmuth is entitled to summary judgment on Nelson's claim for breach of contract.[8]

### B. Counts II and IV – Bad Faith

Under Alabama law, a plaintiff can recover for an insurer's bad faith refusal to pay a claim under two theories: a "normal" bad faith claim and an "abnormal" bad faith claim. *White v. State Farm Fire & Cas. Co.*, 953 So. 2d 340, 347–48 (Ala. 2006). A normal bad faith claim is one where the insurer refused to pay, and an abnormal bad faith claim is one where the insurer failed to investigate. "These are not two torts but a single tort with different options for proof." *Coleman v. Unum Grp. Corp.*, 207 F. Supp. 3d 1281, 1284 (S.D. Ala. 2016); *see also State Farm Fire & Cas. Co. v. Brechbill*, 144 So. 3d 248, 256–58 (Ala. 2013). Abnormal bad faith claims

> have been limited to those instances in which the plaintiff produced substantial evidence showing that the insurer (1) intentionally or recklessly failed to investigate the plaintiff's claim; (2) intentionally or recklessly failed to properly subject the plaintiff's claim to a cognitive evaluation or review; (3) created its own debatable reason for denying the plaintiff's claim; or (4) relied on an ambiguous portion of the policy as a lawful basis to deny the plaintiff's claim.

*State Farm Fire & Cas. Co. v. Slade*, 747 So. 2d 293, 306–07 (Ala. 1999).

---

[8] Because Frankenmuth is entitled to summary judgment on this aspect of its motion, the court declines to consider Frankenmuth's remaining arguments.

To prove Frankenmuth's bad faith refusal to pay, Nelson must show by substantial evidence:[9] (1) the breach of an insurance contract between the parties; (2) Frankenmuth's intentional refusal to pay his claim; (3) the absence of any reasonably legitimate or arguable reason for that refusal; and (4) Frankenmuth's actual knowledge of the absence of any legitimate or arguable reason. *See Lunsford*, 621 So. 2d at 978. To prove Frankenmuth failed to investigate, Nelson must prove an additional element: Frankenmuth intentionally failed to determine whether there was a legitimate or arguable reason to refuse to pay the claim. *See Walker v. Life Ins. Co. of N. Am.*, 59 F.4th 1176, 1187 (11th Cir. 2023).

Nelson "bears a heavy burden" on his bad faith claim—he must show the "underlying contract claim [is] so strong that [he] would be entitled to a preverdict judgment as a matter of law." *See Acceptance Ins. Co. v. Brown*, 832 So. 2d 1, 16 (Ala. 2001); *Jones v. Alfa Mut. Ins. Co.*, 1 So. 3d 23, 32 (Ala. 2008). This is true for both normal and abnormal bad faith claims. *See Walker*, 59 F.4th at 1187 *(citing White*, 953 So. 2d at 348 (normal bad faith), and *Brechbill*, 144 So. 3d at 258 (abnormal bad faith)). Further, "all bad-faith claims fail on summary judgment 'where the trial court . . . expressly [finds] as a matter of law that the insurer had a reasonably legitimate or arguable reason for refusing to pay the claim at the time the

---

[9] Substantial evidence is "'evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.'" *See Indep. Fire Ins. Co. v. Lunsford*, 621 So. 2d 977, 978 (Ala. 1993) (quoting *West v. Founders Life Assur. Co. of Fla.*, 547 So. 2d 870, 871 (Ala. 1989)).

claim was denied.'" *Id.* (quoting *Brechbill*, 144 So. 3d at 260). Put another way, to defeat Nelson's bad faith claim, Frankenmuth "does not have to show that its reason for denial was correct, only that it was arguable." *See Liberty Nat. Life Ins. Co. v. Allen*, 699 So. 2d 138, 143 (Ala. 1997).

As established above, Nelson cannot show as a matter of law that Frankenmuth breached the terms of the Policy. Frankenmuth is therefore entitled to summary judgment on Nelson's bad faith claims. Even if Nelson could establish a question of fact regarding whether the Property was vacant, Frankenmuth would still be entitled to summary judgment on the claim for bad faith.

Nelson complains that Frankenmuth "never even attempted to estimate the building loss and did not estimate the contents/personal property loss because it asserted it did not have to do so because Nelson had no coverage." (Doc. 22 at 22). This argument does not address the required elements of either bad faith claim. For both bad faith failure to pay and bad faith failure to investigate, Nelson must prove that Frankenmuth lacked any reasonably legitimate or arguable reason for its refusal. *See Allen*, 699 So. 2d at 143.

As established above, there is no question that Frankenmuth had a reasonably legitimate basis to deny the claim. Further, the evidence demonstrates Frankenmuth investigated Nelson's claim. Among other things, Frankenmuth obtained photos of the damaged Property, requested and reviewed documents from Nelson, and examined Nelson under oath. Frankenmuth ultimately determined coverage did not

19

exist because the Property was vacant as defined by the Policy. Whether or not that determination was correct, it was, as a matter of law, an arguable basis to deny Nelson's insurance claim under the terms of the Policy. Accordingly, Frankenmuth is entitled to summary judgment on Counts II and IV for bad faith failure to pay and bad faith failure to investigate.

## V. Conclusion

For the foregoing reasons, Frankenmuth's motion for summary judgment is **GRANTED.** (Doc. 21). A separate judgment will be entered.

**DONE** this 20th day of March, 2026.

_____
STACI  G. CORNELIUS
U.S. MAGISTRATE JUDGE